[No. B160390. Second Dist., Div. Four. Jan. 23, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
AARON COLLINS, Defendant and Appellant.

## COUNSEL

Susan K. Keiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and William H. Davis, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**VOGEL (C .S.), P. J.—**

## INTRODUCTION

While incarcerated in state prison, defendant Aaron Collins was charged with possession of heroin in state prison, possession of heroin for sale, and battery on a nonconfined person. It was further alleged defendant had suffered four prior felony convictions.

After the trial court denied defendant's motion to suppress evidence, defendant pled nolo contendere to possession of heroin in state prison and admitted one prior conviction. The remaining charges and prior conviction allegations were dismissed and defendant was sentenced to a four-year term. The trial court stated it would issue a certificate of probable cause to permit defendant to challenge the denial of his earlier motion to disclose an informant's identity.

On this appeal, defendant primarily contends the trial court erred in denying his motion to suppress. We find no merit to this contention. Secondarily, he seeks review of the trial court's denials of his motions to disclose the identity of an informant and for *Pitchess*[1] discovery. We conclude that to the extent these two motions were intertwined with litigating the legality of the search, these contentions are cognizable on this appeal pursuant to Penal Code section 1538.5, subdivision (m), notwithstanding defendant's plea. Consequently, we have reviewed the sealed transcript of the in camera hearing conducted in regard to the informant motion and find no error. In regard to the *Pitchess* motion, the court denied the motion in a public proceeding on the basis that defendant had failed to establish good cause for the discovery request. That ruling was not an abuse of discretion. We therefore affirm the judgment.

## STATEMENT OF FACTS

The following evidence was presented at the hearing on defendant's motion to suppress evidence. (Pen. Code, § 1538.5.)

The search of defendant was initiated after several prison officials at Lancaster State Prison received anonymous notes stating defendant was selling drugs.

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305].

The first anonymous note was received on May 24, 2000, by Correctional Lieutenant Rose Walton. The note had been slid under her office door. Walton found it when she arrived at work at 6 a.m. The handwritten note identified defendant by name, cell, and prison number. The note stated he was selling drugs in the prison. The note was not signed. After reading the note, Walton threw it into the trash. She explained she did so "because most of the notes that are slid underneath doors are just another reason to try to get another inmate off the yard to allow them [the senders of the notes] to continue to sell their drugs." When asked on cross-examination by defense counsel: "So you didn't determine it to be credible at that time," Walton replied: "Right."

The next morning, May 25, Walton received another note in the same manner. She testified the note reiterated defendant had drugs on his person and read, in effect: "So you are not going to do anything to Collins [defendant] until something serious happens on the yard?" The note also said copies were being sent to other prison personnel. The note did not identify its writer. Walton contacted Facility Captain Linda Schulteis to discuss the notes.

Schulteis had received a copy of the same unsigned note that morning of May 25. The note stated defendant had a large amount of drugs "on him right now" and threatened to inform the inspector general of these facts. The two compared the two notes and Schulteis directed Walton to search defendant and his cell as soon as possible. Schulteis testified she did so because "[h]aving the information and having the responsibility to preserve the safety and security of the institution, it was my job to order that we react to the information." Walton explained the purpose of the search was to determine the validity of the charges made in the anonymous notes because the notes created a reasonable suspicion of drug possession.

The anonymous notes that Walton, Schulteis, and other prison officials had received were destroyed. This destruction was consistent with prison policy because the notes were not going to be used either as part of a disciplinary action against defendant, such as placement in administrative segregation or loss of time credits, or for the purpose of a criminal prosecution. Schulteis explained the anonymous notes could not form the basis of a disciplinary action because there was "no test of reliability of the informant or informants." Disclosure of the notes would not have revealed the identity of their author(s).

The prison officials intended to conduct an "unclothed body search" of defendant. Schulteis explained that meant "[t]o have the inmate completely disrobe and to look at every part of the inmate's body but not to be intrusive or invasive upon the inmate's body." It requires the inmate to "[c]ough and bend over . . . to look to see if there's anything protruding from his rectum." They "can only look" but "can't touch" the rectal area.

Prison policy authorizes visual body cavity searches in a variety of circumstances. For instance, California Code of Regulations, title 15, section 3287, subdivision (b) provides, in pertinent part: "An inmate is subject to an inspection of his or her person, either clothed or unclothed, when there is a substantial reason to believe the inmate may have unauthorized or dangerous items concealed on his or her person, or that he or she may have been involved in an altercation of any kind. Such inspections may also be a routine requirement for inmate movement into or out of high security risk areas. Random or spot-check inspections of inmates may also be authorized by the institution head to prevent possession and movement of unauthorized or dangerous items and substances into, out of, or within the institution."

Section 52050.18.1 of the Operations Manual for the Department of Corrections (Operations Manual) provides: "Inmates are subject to an inspection of their person either clothed or unclothed when there is reasonable cause to believe the inmate may have unauthorized or dangerous items or substances concealed on their person."

And section 52050.18.3 of the Operations Manual, entitled "Unclothed Body Search," provides that after the inmate has completely disrobed, "[s]taff shall inspect and search each item of clothing and visually inspect the inmate's body. [¶] The inmate shall face the staff member who shall visually inspect the inmate's hair, ears, mouth, nose, body, armpits, hands, scrotum, genitals, and legs. The inmate shall turn away from staff upon instruction and staff shall then inspect the inmate's back, buttocks, thighs, toes, bottom of the feet[,] and lastly, the anal area by having the inmate bend over, spread the cheeks of their buttocks and cough."

Schulteis's testimony amplified this policy. She explained a random unclothed body search can be conducted in a variety of circumstances: after a prisoner has visited with an outsider, after a prisoner has returned from an outside location such as a work assignment, and after a prisoner has received medical treatment. The search can also be conducted any time a prison officer has a reason to believe an inmate might have contraband on their person. There is no requirement an officer obtain permission from a supervisor to conduct an unobtrusive unclothed body search.

In contrast, a body cavity search requires reasonable cause and judicial authorization. It can only be performed by medical personnel in a medical setting.[2]

---

[2] California Code of Regulations, title 15, section 3287, subdivision (b)(2) provides: "An inspection of body cavities, other than visual or metal detector inspections, will be conducted in a medical setting under the direct supervision of a physician. Any physical intrusion into

After Walton received her direction from Schulteis, she contacted Officer Anthony Bennett. As defendant was exiting the dining hall, Walton "ordered Officer Bennett to conduct a clothed body search and then [to] place [defendant] in restraints and handcuffs and escort him to the medical clinic" to "[c]onduct an unclothed body search."[3]

Bennett first conducted a clothed body search to see if anything was concealed under defendant's clothes. This search is similar to a patdown search. The officer found nothing. He then handcuffed defendant and informed him he would be taken to the medical clinic for an unclothed body search.

As Bennett was escorting defendant to the medical clinic, defendant began to physically resist. In particular, defendant "began to dig with his right hand . . . down the back of his pants and inside his boxer shorts[,] . . . lifting his boxer shorts up." To Bennett, "it seemed like [defendant] was reaching into his pants to get rid of something." As Bennett stopped defendant's actions, Officer Michael Becker came over to assist him in taking defendant to the medical clinic.

In the medical clinic, Bennett removed defendant's handcuffs and directed him to remove his clothes. Defendant complied. Bennett searched each item of clothes, found nothing, and then "performed the specific steps of the unclothed body search: looked at his hands, both top and bottom, underneath his arms as he raised them, his armpit area, inside his mouth, behind his ears [and] had him lift his penis [to] see if there was anything hidden."

Having completed that aspect of the search, Bennett asked defendant "to do a squat and cough" in which defendant would "turn around, bend over and cough" so the officer could perform a visual inspection of the surface area of defendant's rectal cavity. Defendant refused, became verbally agitated, demanded to know why he was being subjected to a search, and eyed the toilet area in the medical clinic. Because Bennett believed if defendant "had anything, he was going to try to make it to the toilet," the officer placed himself between defendant and the toilet area. Defendant responded by rushing toward Bennett with great force. At that point, Becker saw defendant use his right hand to remove an object from his buttocks. When defendant

---

body cavities must be performed by a physician, and then only after all less obtrusive methods have failed to bring the inspection to a conclusion."

In a similar vein, section 52050.21 of the Operations Manual provides: "Correctional personnel, other than qualified medical staff, shall not conduct a search of an inmate's body cavities, other than visual or metal detector inspections. The search shall be conducted in a medical setting and any physical intrusion into body cavities shall be performed by a physician."

[3] A search was also conducted of defendant's cell. No contraband was found.

struck Bennett, the object fell from defendant's hand to the floor. The two officers quickly restrained defendant. Becker retrieved the object. The object, the size of a golf ball, consisted of several balloons wrapped in plastic wrap. The balloons contained heroin.

Defendant testified that after Bennett completed the unclothed body search, Bennett "did not tell [him to] turn around, bend over and cough or squat." Instead, according to defendant, the officer simply told him: "Turn around for a rectal search." Defendant refused and questioned the legality of the search which he believed involved "a probe search of [his] rectal cavity specifically for drugs." After defendant was told to comply, Bennett suddenly "grabbed" him and "took [him] down to the ground" and handcuffed him. Defendant never attacked the officer. Defendant denied having withdrawn the balloon package from his buttocks, denied having dropped or thrown anything in the medical clinic, and denied having seen the balloon package on the floor of the clinic.

In the trial court, the defense theory was that Bennett intended to subject defendant to an unlawful rectal cavity search, not a mere unobtrusive visual check of defendant's anal area. Although defendant never testified that after being restrained he was forcibly subjected to a rectal cavity search, defense counsel nonetheless suggested that had happened in arguing the heroin should be suppressed.[4]

The trial court explicitly rejected the defense characterization of the events. It ruled:

"I think there's a difference between a prison setting and the setting on the streets. I also think that reasonable cause is an objective legal test.

"I would like to take and distill things down to the simplest terms so I can get to the bottom of the issues.

"Over the last several days, I've learned the following:

"That the officials of the Department of Corrections received information that [defendant] was trafficking in narcotics and after the first note was received, they received a second note or more people received the second note.

"Basically, the second note to me was something more or less a threat to the prison officials that if they didn't do something, that there was going to be some whistle-blowing.

---

[4] The written motion to suppress evidence filed before the evidentiary hearing also claimed there had been "a forcible full body cavity search" of defendant.

"Then Assistant Warden Schulteis, who I particularly found to be the most credible witness of everybody—I'm not saying anybody else was not credible—but she was the most credible one, she made a determination that [defendant] had to be searched.

"I think that not only did the Department of Corrections have a right to investigate and conduct a search of [defendant], I think they had a duty to do it.

"The officers did their duty and they started an unclothed body search of the exterior portion of [defendant's] body.

"During the search, this golf ball-sized object was seen dropping from his hand. There's not been one bit of evidence that's been produced to indicate that there was any intrusive, internal rectal probing or internal search of [defendant].

"Mr. Collins [defendant], I mean this as a compliment, you have a very resourceful mind and a great imagination.

"I think that [your] past experience in searches, as [you] testified to, kind of belies what [you] testified to yesterday [that you believed the officers intended to perform a rectal cavity search].

"It certainly would have been nice if the Department of Corrections had kept all the letters; however, I don't think that the letters were critical to the 1538.5 motion.

"I think [defendant's] use of force was not proper or in a proper way to resist what he deemed to be an unlawful search. There's other methods to remedy what he thought was wrong and I particularly think that [defendant's] legal reasoning was wrong.

"I grant you there certainly were conflicts in testimony [among the People's witnesses]. . . . But I don't think any of the inconsistencies were really important to the determination of this motion, so I'm going to deny it."

After the trial court denied the motion to suppress evidence, defendant pled nolo contendere to possession of heroin in state prison and admitted one prior conviction. The prosecutor dismissed the other charges and prior conviction allegations. The court sentenced him to a four-year term, to be served consecutively to his present term.

The court indicated it would issue a certificate of probable cause to permit defendant to challenge on appeal the denial of his earlier motion to disclose the identity of the author of the two notes.[5]

This defense appeal follows.

## DISCUSSION

## A. MOTION TO DISCLOSE INFORMANT'S IDENTITY

*Factual Background*

In the beginning stage of the case, defense counsel had asked for disclosure of the identity of the individual(s) who wrote the notes delivered to the prison officials. Prison officials invoked the privilege of nondisclosure. (Evid. Code, §§ 1040–1041.) Thereafter, two motions to obtain that information were filed.

The first, filed by counsel, urged, "this informant is a material witness on the issue of guilt or innocence in this action, and as such, the disclosure of the informant's identity is essential to a full and fair determination of the case." Counsel's declaration averred: "A reasonable possibility exists that the confidential informant could give evidence on the issue of guilt or innocence in this action that would result in the exoneration of the defendant."

The second, filed by defendant in pro. per., essentially urged disclosure was necessary for a fair adjudication of the motion to suppress. Given that the notes had been destroyed, the motion questioned whether the notes ever existed or, if they did, whether they contained the information the correctional officers represented had been in the notes.

Before the evidentiary hearing on the suppression motion commenced, defense counsel requested the court to conduct an in camera hearing. He argued, "the informant issue is relevant to the 1538.5 and that is the primary basis of our motion to suppress" because the informant's notes had been the reason the prison officers decided to search defendant.

The court conducted an in camera hearing at which Schulteis and Walton testified about the anonymous notes. Thereafter, the court denied the motion in public proceedings. It ruled: "There is no reason to disclose the identity, it

---

[5] As later issued, the certificate of probable cause merely reads: "Good cause appearing pursuant to the provisions of Penal Code section 1237.5, that the above-named defendant has reasonable constitutional, jurisdictional or other grounds going to the legality of the proceedings herein and the validity of the plea, [¶] It is hereby certified that there is probable cause for an appeal from the judgment of conviction rendered upon the defendant's guilty plea in this case."

would not help [defendant] in any way. There is no conceivable way it can help [him], absolutely none. . . . There's just simply no way it would help him. . . . If I thought for a minute there was any potential that it would help [defendant], I'd certainly tell them [the prison officials] to disclose it, but there just isn't any potential."

*Discussion*

A sealed transcript of the in camera hearing has been forwarded to this court. Defendant asks us to review that transcript "to determine if the trial court followed appropriate procedure and for abuse of discretion." Resolution of that contention requires us to first clarify the dual nature of the motion to disclose. As set forth above, the motion had two theories. One was that the informant was a material witness on the issue of guilt or innocence. The second was that the existence of the informant and the contents of the informant's notes were relevant to litigating the motion to suppress.[6]

■ In regard to the first purpose, well-established precedent makes clear that a guilty plea bars an appellate contention that the trial court improperly denied a defendant's motion to disclose the identity of an informant to assist in establishing the defendant's innocence of the charged offenses. In this context, defendant's plea of nolo contendere has the same legal effect as a guilty plea. (Pen. Code, § 1016; see also *People v. Hobbs* (1994) 7 Cal.4th 948, 955 [30 Cal.Rptr.2d 651, 873 P.2d 1246].) By so pleading, defendant admitted his guilt of the charged offense of possession of heroin in state prison. Defendant cannot admit he possessed the heroin by pleading nolo contendere and then question the judgment on the ground that evidence he was not permitted to discover would have established to the contrary. The two positions are mutually inconsistent. (See *People v. Hunter* (2002) 100 Cal.App.4th 37, 42 [122 Cal.Rptr.2d 229]; *People v. Castro* (1974) 42 Cal.App.3d 960, 963 [117 Cal.Rptr. 295].) "An order denying a motion to disclose the identity of an informant is not subject to review on appeal after the defendant has entered a plea of guilty [citation]. This is so because the purpose of the motion relates solely to the defendant's guilt or innocence, an issue which is removed by the guilty plea." (*People v. Castro, supra,* 42 Cal.App.3d at p. 963; accord, *People v. Coleman* (1977) 72 Cal.App.3d 287, 292–293 [139 Cal.Rptr. 908]; *People v. Howard* (1976) 55 Cal.App.3d 373, 375–376 [127 Cal.Rptr. 557].) We therefore do not address the merits of the contention.

---

[6] Both defendant and the Attorney General initially took the incorrect position that the certificate of probable cause rendered cognizable on this appeal defendant's contentions that the trial court had erred in denying both the motion to disclose the informant's identity and the *Pitchess* motion. Pursuant to Government Code section 68081, we directed the parties to file letter briefs addressing the point. We have received and reviewed those letters.

■  The trial court's issuance of a certificate of probable cause to "permit" appellate review of this issue does not change our conclusion. A certificate of probable cause cannot render reviewable a claim that is otherwise not cognizable on appeal from a guilty plea. (*People v. Hoffard* (1995) 10 Cal.4th 1170, 1178 [43 Cal.Rptr.2d 827, 899 P.2d 896]; *People v. Kaanehe* (1977) 19 Cal.3d 1, 9 [136 Cal.Rptr. 409, 559 P.2d 1028]; *People v. Meyer* (1986) 183 Cal.App.3d 1150, 1157 [228 Cal.Rptr. 635].) As the record does not reflect that defendant's plea was premised upon the assumption he could obtain appellate review of the denial of his informant motion, defendant is not entitled to withdraw his plea because we now decline to reach the merits of the challenged ruling. (*People v. Hernandez* (1992) 6 Cal.App.4th 1355, 1361, fn. 6 [8 Cal.Rptr.2d 324] and cases discussed therein.)

■  In regard to the second purpose of the motion, defendant may pursue that contention by virtue of Penal Code section 1538.5, subdivision (m). The statute provides, in pertinent part: "A defendant may seek further review of the validity of a search or seizure on appeal from a conviction in a criminal case notwithstanding the fact that the judgment of conviction is predicated upon a plea of guilty." This provision has been interpreted to permit appellate review of denial of an informant motion to the extent the motion is "directed to the legality of the search." (*People v. Hobbs, supra,* 7 Cal.4th 948, 956; see also *People v. Seibel* (1990) 219 Cal.App.3d 1279, 1285 [269 Cal.Rptr. 313].)

Having reviewed the sealed transcript of the in camera hearing with that principle in mind, we conclude the trial court properly denied the motion.

### B.  THE *PITCHESS* MOTION

*Factual Background*

Defendant, in pro. per., filed on March 29, 2001, a *Pitchess* motion seeking discovery of the personnel records for Schulteis and Walton. Defendant's declaration averred the "items requested may contain records showing disciplinary actions and suspension of said officers following review of the complaints by superior officers and fellow officers concerning past incidents of the officers engaging in illegal activities, improper tactics, dishonesty, planting evidence, improper search and seizure, and harassment. . . . [¶] The material sought is necessary in order to properly prepare my case and is material and relevant because it is my contention that Correctional Officers Linda Schulteis and Rose Walton did not follow policy and procedures, destroyed material evidence, and failed to follow search procedures as required under U.S.C. Title XV, tampering with evidence[,] acting without probable cause on an unreliable and bogus confidential letter that was

destroyed by design. [¶] The materials sought may in fact contain complaints of a like nature made by other inmates and/or citizens against these officers. Such information would be used by the defense to locate and call witness to testify that these officers have a character trait, habit, and custom for engaging in illegal conduct or dishonest conduct."

On April 11, 2001, the custodian of records for the Department of Corrections filed opposition to the motion. The opposition urged, inter alia, that defendant's request was overbroad and not supported by good cause.

On April 17, 2001, the court ruled upon several defense requests, including the *Pitchess* motion.[7] At this juncture, defendant was representing himself. Counsel for the custodian of records argued: "[I]t's [defendant's] contention that [Walton and Schulteis] did not follow policy and procedures, destroyed material evidence and failed to follow search procedures. That's from his declaration. But there's no evidence, no factual basis to determine that they ever had any dealings with the evidence and that they participated in the search. Therefore, there could not be good cause for obtaining their personnel records." Defendant responded: "Whether [Schulteis] is dishonest, whether this person has some ulterior motive to destroy the note, I believe that it was improper and I believe that it is an act. There are signs of dishonesty there and that was the purpose why the—there is a need for *Pitchess* motion to determine the validity of this person's character, to determine whether there is bias or even to determine if [I] was set up." The court ruled: "I don't think your application or your motion for *Pitchess* is sufficient and we're not going to get into that."[8] The matter was never formally revisited.[9]

*Discussion*

Defendant contends "the trial judge's denial of the <u>Pitchess</u> motion was an abuse of discretion."[10] As explained above in regard to our review of the

---

[7] The record on appeal did not include a transcript of the proceedings conducted on April 17, 2001. Pursuant to rule 12(a) of the California Rules of Court, we directed preparation and submission of a transcript of that proceeding.

[8] The court's April 17, 2001 minute order states: "Pitchess motion is held. The court finds discovery has been complied with."

[9] Over a year later, defense counsel stated, in the course of litigating the motion to suppress, that he had filed "a *Pitchess* motion in regards to Lieutenant Walton." The clerk's transcript does not contain such a motion and the reporter's transcript contains no record of any proceedings conducted on such a motion.

[10] When this case was first briefed, both defendant and the Attorney General proceeded upon the incorrect assumption that the transcript of the April 17, 2001 hearing—a transcript that was not included in the record on appeal—was sealed. The parties therefore requested us to review that transcript to determine if the trial court had followed proper procedure and not abused its discretion. We directed preparation of the transcript. (See fn. 7, *supra*.) After we

court's ruling on the informant motion, the certificate of probable cause is legally irrelevant to our review of this ruling. Since this appeal is authorized by Penal Code section 1538.5, subdivision (m) and the *Pitchess* motion was intertwined with litigating the legality of the search, the trial court's denial of that motion is cognizable on this appeal.

■ Evidence Code section 1043, subdivision (b)(3) provides that a defendant seeking discovery of peace officer personnel records must include an "[a]ffidavit[] showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation . . . ." "A showing of 'good cause' requires defendant to demonstrate the relevance of the requested information by providing a 'specific factual scenario' which establishes a 'plausible factual foundation' for the allegations of officer misconduct committed in connection with defendant. [Citations.]" (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1020 [101 Cal.Rptr.2d 379].) Absent such a showing, an officer's personnel records are not relevant to any issue in the case. (*Ibid.*) A trial court's ruling on a *Pitchess* motion is reviewed under the abuse of discretion standard. (*City of San Jose v. Superior Court* (1998) 67 Cal.App.4th 1135, 1145 [79 Cal.Rptr.2d 624].)

In this case, the trial court in essence found no good cause for the requested discovery and therefore never required the custodian of records to produce the personnel records for an in camera review. That decision was not an abuse of discretion. For one thing, neither Schulteis nor Walton was involved in the attempted visual body cavity search that ultimately led to the discovery of the heroin. The involved officers were Bennett and Becker; in particular, Becker was the individual who retrieved the heroin balloons from the floor after defendant dropped them there. For another thing, defendant's declaration merely made general allegations of misconduct against Schulteis and Walton without alleging any facts that provided reason to believe the misconduct had occurred. Consequently, defendant failed to establish a "specific factual scenario" establishing a "plausible factual foundation" for allegations of misconduct by Schulteis or Walton that would justify discovery of their personnel records. (Compare *People · v. Hustead* (1999) 74 Cal.App.4th 410, 415–418 [87 Cal.Rptr.2d 875] [good cause for *Pitchess* discovery was established when the defendant, who was charged with evading arrest while in a motor vehicle, alleged the arresting officer had made false statements in his police report about the defendant's driving], and *People v. Gill* (1997) 60 Cal.App.4th 743, 750–751 [70 Cal.Rptr.2d 369] [good cause for *Pitchess* discovery was established when the defendant

received it and learned it was the transcript of a hearing conducted in open court, we forwarded a copy of it to each counsel and permitted them to file letter briefs on the question of whether the trial court's ruling was proper. Those briefs have now been received and considered.

sought complaints against the specific officer *who searched him* and alleged the officer had planted the contraband to cover up for the use of excessive force].)

## C. MOTION TO SUPPRESS EVIDENCE

### 1. *Violation of the Fourth Amendment*

Defendant first contends "that while prison authorities may conduct an unclothed search for no reason, or for a good reason, they cannot conduct one as they did here for a bad reason." He argues the search was conducted for a "bad reason" because it "was based on unreliable, unverifiable letters that lacked any indicia of trustworthiness or firsthand knowledge" and that were improperly destroyed by prison officials. The contention misframes the issue and, in any event, lacks merit. The dispositive issue is whether given the notes received by prison officials, a visual body cavity search[11] of defendant, an individual incarcerated in state prison, would have violated the constitutional prohibition on unreasonable searches and seizures. We conclude it would not have.

Two decisions from the United States Supreme Court have addressed prison searches.

The first decision is *Bell v. Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861]. At issue was the constitutionality of a visual body cavity search conducted any time a prisoner had concluded a visit with an outsider. In particular, the question was whether such searches could be conducted absent probable cause. Prison officials contended the visual cavity searches were necessary to deter and detect smuggling into the prison of drugs, weapons, and other contraband. In determining the issue, the court wrote: "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. *Courts must consider the scope of the*

---

[11] Various portions of defendant's brief refer to his theory advanced in the trial court that prison officials intended to perform a full rectal cavity search upon him. The trial court explicitly rejected that theory, finding prison officials only intended to perform a visual body cavity search. Because substantial evidence in the form of the prison officials' testimony supports that finding, we disregard defendant's arguments based upon his contrary theory. (*People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621] ["In . . . a proceeding [under Penal Code section 1538.5] the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence."].)

*particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.* [Citations.] A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. *And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record . . . and in other cases.* [Citations.]" (*Id.* at p. 559, italics added.) The court concluded that "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates," the searches could be conducted "on less than probable cause." (*Id.* at p. 560.) The court did not state what was required, other than to hold that "[t]he searches must be conducted in a reasonable manner." (*Ibid.*)

The second decision is *Hudson v. Palmer* (1984) 468 U.S. 517 [82 L.Ed.2d 393, 104 S.Ct. 3194]. There the question was whether random searches could be conducted of prisoners' cells without any particularized suspicion contraband was being concealed. The court upheld that procedure, finding a prisoner had no legitimate expectation of privacy within the cell. (*Id.* at pp. 526–530.) The court observed random searches of cells were "the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband." (*Id.* at p. 528.)

Two decisions from our state's Courts of Appeal have upheld body cavity searches.

In *People v. West* (1985) 170 Cal.App.3d 326 [216 Cal.Rptr. 195], two officers separately received information that marijuana was being brought into an honor farm. A decision was made for medical staff to conduct a full body cavity search of a group of 40 to 44 inmates when they returned to the honor farm from that day's work furlough. A search of the defendant's rectum performed by a doctor using an acceptable medical procedure disclosed marijuana. The Court of Appeal upheld the constitutionality of the search. Beginning with the premise that the "protections afforded by the Fourth Amendment to persons not incarcerated generally are not applied in the same manner to persons held in lawful detention by the government" (*id.* at p. 329), the court found the search to be reasonable. The information the officers received constituted "adequate justification to conduct the search" (*id.* at p. 332), given that the honor farm inmates were away from the facility in an unsupervised setting. The search was performed by a licensed physician using proper procedures. And the government had an undisputed right to stop the flow of contraband into a custodial facility.

In *People v. Pifer* (1989) 216 Cal.App.3d 956 [265 Cal.Rptr. 237], a group of prisoners was transported from one high-risk prison to another high-risk

prison. At the incoming prison, all of the new prisoners were X-rayed as part of a routine procedure, without any particularized suspicion that any of them possessed contraband. The X-ray performed on the defendant showed a foreign object in his rectal cavity. He was confronted with the X-ray and directed to remove the object. He complied. The object was a hypodermic syringe. On appeal, defendant contended the X-ray search violated the Fourth Amendment because there was neither probable cause nor reasonable suspicion he had contraband concealed on or in his person. The Court of Appeal found the search reasonable and therefore lawful. The prison had a legitimate institutional need to take reasonable steps to prevent contraband from being introduced. It is common knowledge inmates secrete contraband in their body cavities so that a lesser search of their person, clothes, or personal belongings would not have revealed the contraband. And the X-ray search, conducted by a specialized technician, was not harmful or uncomfortable. (*Id.* at pp. 961–962.)

Although no California appellate court has determined the constitutionality of a visual body cavity search, several federal Courts of Appeals have addressed the issue. Each has upheld the constitutionality of a policy that required a visual body cavity search or strip search after certain activities such as a visit to the law library, infirmary, or exercise room or an encounter with an outsider *irrespective of whether the prison officials entertained a reasonable suspicion the prisoners had concealed contraband on their persons.* Given the legitimate penological need to prevent drugs and weapons from being introduced into or transported throughout a prison and the relative lack of intrusiveness involved in the search, the policies met the constitutional requirement of reasonableness even without any specific evidence linking a prisoner to possession of contraband. (See, e.g., *Goff v. Nix* (8th Cir. 1986) 803 F.2d 358, 368–371 [upholding policy to conduct visual body cavity search of inmates after returning from visits or exercise to prevent introduction of contraband or weapon]; *Campbell v. Miller* (7th Cir. 1986) 787 F.2d 217, 228 [upholding policy to conduct visual body cavity search before and after visit to prison library]; *Arruda v. Fair* (1st Cir. 1983) 710 F.2d 886, 886–888 [upholding policy to strip search all inmates in special maximum security unit who go to prison law library, infirmary, and receive visitors].)

██ From all of the above precedents, we distill the following principles. A prison has a compelling and uncontroverted interest in preventing the introduction into or the transporting throughout the prison of contraband and in maintaining order in the institution. A prisoner has a very limited reasonable expectation of privacy in regard to a search of his person. There is no requirement that a search be supported by either probable cause or reasonable suspicion; instead the relevant inquiry is whether under all of the circumstances the search was reasonable. And the determination of reasonableness depends, as it does in any Fourth Amendment case, on the specific facts

presented. In particular, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (*Bell v. Wolfish, supra,* 441 U.S. 520, 559.)

■ Applying those principles to this case, we conclude the intended visual body cavity search of defendant was reasonable and therefore constitutional. The search was to be conducted only after prison officials received two anonymous notes stating defendant was selling drugs in the prison, the second of which specifically stated defendant had the drugs on his person. Such notes were often sent by rival drug dealers, a circumstance corroborated in this case by the fact the second note contained a veiled threat that unless the tip was acted upon, there would be violence. Given the prison's uncontested right to find and destroy drugs as well as its obligation to avoid potentially volatile situations, the information from the notes constituted more than a sufficient and legitimate justification for the search. Contrary to what defendant urges, the fact the notes could not form the basis of an internal disciplinary action because they were anonymous and not from reliable sources is not dispositive. As set forth above, case law makes clear a prison search is not subject to a calculus of probable cause or reasonable suspicion.

■ Furthermore, the search of defendant was carried out in a reasonable manner that protected his sense of personal dignity. He was escorted to a private area—the medical clinic—in which he was asked to disrobe. Two male officers observed him. The search of his rectal cavity was to be limited to a visual inspection; defendant was requested only to bend over and cough to facilitate observation. Neither officer attempted to touch defendant's anus or insert his fingers or any other object into his rectum.[12] In sum, the intended visual body cavity search was reasonable. The trial court properly denied the motion to suppress evidence.

## 2. *Violation of Prison Guidelines*

Defendant makes a passing argument that "[p]rison officials failed to comply with CDC regulations requiring the completion of certain forms and preserving the [two] letters [from the anonymous informant(s)] thereby violating [his] Fourth Amendment and due process rights." Without citation to any authority, he implies this purported violation requires suppression of the heroin balloons. We disagree.

---

[12] Defendant's briefs echo his trial court argument that he reasonably believed the officers intended to conduct a rectal cavity search. As set forth earlier, the trial court rejected that claim and substantial evidence supports its finding on that point. We therefore disregard any argument founded on this claim. (See fn. 11, *ante.*)

■ The prison regulations to which defendant refers only require preservation of an informant's note and preparation of an internal prison form (form 1030) when an informant's note will be the basis of a disciplinary action against the prisoner. Here, as explained by the testimony of the prison officials, the notes could not and did not form the basis of any disciplinary action because they were anonymous. Contrary to what defendant suggests, the disciplinary action taken against him after the search was not the result of the notes; instead it directly flowed from the discovery of the heroin on his person and his assault on Officer Bennett. Consequently, there was no violation of prison regulations.[13]

In any event, even if there had been such a violation—a finding we do not make—that conclusion would not assist defendant. The electorate's enactment in 1982 of Proposition 8 eliminated, inter alia, judicially created remedies for violations of administrative provisions unless the federal Constitution requires the exclusion of the evidence obtained as a result of those violations. (*In re Lance W.* (1985) 37 Cal.3d 873, 886–887 [210 Cal.Rptr. 631, 694 P.2d 744]; *People v. Pifer, supra,* 216 Cal.App.3d 956, 962–963; and *People v. West, supra,* 170 Cal.App.3d 326, 330–331 [216 Cal.Rptr. 195].) Defendant has failed to show how violation of these prison regulations so implicates federal constitutional rights that a violation should result in the exclusion of the evidence.

## 3. *Violation of the Eighth Amendment*

Defendant's briefs make passing references to the Eighth Amendment as if to suggest that its provisions were violated in this case and that said violation requires suppression of the evidence. The argument is unavailing for three separate reasons.

The first is that it was not raised below so that defendant is precluded from raising it for the first time on appeal. (*People v. Pifer, supra,* 216 Cal.App.3d 956, 963 [cert. den. *Pifer v. California* (1990) 498 U.S. 938 [112 L.Ed.2d 307, 111 S.Ct. 342].)

The second is that "for such a claim to succeed, [defendant] must show eliberate indifference to serious medical needs rising to a level of unnecessary and wanton pain. [Citation.]" (*People v. Pifer, supra,* 216 Cal.App.3d at p. 963.) There is no evidence to support such a claim in the present action. As explained

---

[13] In the trial court, defendant, citing *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], moved to dismiss on the basis that due process required the prison officials to retain the two anonymous notes. The trial court denied the motion. On this appeal, defendant does not pursue that claim.

earlier, substantial evidence supports the trial court's finding that the prison officials only intended to perform a visual body cavity search. (See fn. 11, *ante*.)

The third is that even if defendant had presented "sufficient facts to support a violation of the Eighth Amendment, this would entitle [him only] to sue prison authorities for a civil rights violation pursuant to 42 United States Code section 1983, not to a suppression of evidence obtained as a result of such a search. [Citation.]" (*People v. Pifer, supra,* 216 Cal.App.3d at p. 963.)

## DISPOSITION

The judgment is affirmed.

Hastings, J., and Curry, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 14, 2004.